Case No. CV-0512156

Dept. No. II

SEVENTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR THE COUNTY OF WHITE PINE

---000--

XTREME FAITH ACADEMY, INC., dba ABUNDANT LIFE ACADEMY, a Utah corporation; ROBIN CROUCH and HIDDEN CANYON RANCH, INC., a Nevada corporation,

Plaintiffs,

-vs

ROBIN LANDRY, ET AL.,

Defendants.

DEPOSITION OF

LARRY ROBB

Wednesday, April 18th, 2007
Reno, Nevada



KATE MURRAY, CCR #599

Reported by:

BE IT REMEMBERED that on Wednesday, April 18th, 2007, at the hour of 2:07 p.m., of said day at the offices of OSBORNE, OHLSON & HALL, 555 South Center Street, Reno, Nevada, before me, KATE MURRAY, a notary public, personally appeared LARRY ROBB, who was by me first duly sworn, and was examined as a witness in said cause.

---000--

LARRY ROBB,

after having been duly sworn, testified as follows:

EXAMINATION

BY MR. OHLSON:

Q. What is your name?

A. Larry Robb.

Q. Is that your full name?

A. Larry J. Robb.

Q. No Lawrence?

A. No.

Q. What does **"J"** stand for?

A. John.

Q. Your date of birth?

A.    8/16/1963.

A. All reporting parties are confidential.

Q. Even someone else who works in the department?

A. Anyone that reports child abuse and neglect remains confidential.

Q. Did you get some information from the Carson City office in April 2005 regarding Abundant Life Academy?

A. I had discussions with our Carson City office, yes.

Q. With whom in your Carson City office?

A. Well, there were many discussions. I believe I talked with the licensing bureau.

Q. Who did you first talk to about ALA?

A. In terms of the sequence, I don't recall.

Q. Did you directly report to Robin Landry during the period of time about which we're speaking?

A. Yes.

Q. What does that mean? Was she your supervisor?

A. Yes.

Q. Did Ms. Landry inform you that there had been an e-mail complaint regarding abuse and neglect of children at the ALA facility?

**Page 10**

SUNSHINE REPORTING SERVICES

A. I don't recall.

Q. Were you asked by Ms. Landry to undertake an investigation of ALA?

A. Yes.

Q. Do you recall when that was?

A. Well, I think it was initiated around the 21st of April.

Q. 2005?

A. 2005.

Q. Okay. When you say, "It was initiated," you make it sound like somebody else did it?

(

A. The Ely office staff. I was not personally involved in the investigation on the 21st.

Q. Okay. You were not charged -- it was not your idea to form an interdisciplinary staff or team to investigate ALA?

A. The statute requires that we form a team to do those types of investigations.

Q. Did you form the team?

A. Working with the supervisor of the Ely office, a team was formed.

Q. Okay. I think it's a pretty direct question. Were you responsible for forming the team

in your official capacity?

A. I believe before when you asked me, it was prlor to my going down there, and no, that had not occurred.

Q. So that didn't happen? Tina Slaughter spoke incorrectly when she testified that you instructed her to shut ALA down and to take the children into custody prior to the investigation?

A. Which investigation are you referring to?

Q. The beginning of the whole investigation, the one that started with the interdisciplinary team.

A. At the point that I got involved was on the 23rd, and at that time, we went down to ALA and toured the facility. Sunday, that discussion may have occurred.

Q. Between you and Tina Slaughter?

A. Correct.

Q. And that would have been Sunday the 24th?

A. Correct.

Q. What did you tell Tina Slaughter?

A. Well, there had been a series of phone

calls between myself and Ms. Landry about ALA, and the administration either from Ms. Landry directly who I spoke with, the decision was the kids needed to be out of there. They were an unlicensed

Yeah, at that point, we were still talking about the whole licensing issue, the fact they weren't licensed, so -

Q. Do you agree with the judge's assessment

In that sentence that I have just read?

MR. QUINN: Do you recall the sentence?

BY MR. OHLSON:

Q. I'll read it to you again.

A. Okay.

Q. "On April 20th, 2005, social worker Tina Slaughter was told by Larry Robb to take the children from ALA into protective custody."

A. Uh-huh.

Q. You did that?

A. Yeah.

Q. "Apparently, this directive came from Ms. Landry." Is that true?

A. Correct, yeah.

Q. Okay. Another statement of the Court, "Despi te the clear mandate to investigate allegations of abuse or neglect, this case appears

to be a situation where the actions of persons in positions of authority improperly caused the removal of these c h i ldren. "

Do you agree or not?

A. Again, I don't know what happened after the 25th.

Q. Up to the time you left, do you agree or not?

A. Up to the time I had left, they had not been removed.

Q. Let me read it again. Up to the time that you left, I understand that you don't know what happened after that, and you left on the 26th?

A. 25th.

Q. "Despite the clear mandate to investigate allegations of abuse or neglect, this case appears to be a situation where the actions of persons in positions of authority improperly caused the removal of these children." Agree?

A. Yeah.

Q. Yes?

A. Yes.

Q. "It is the opinion of the Court that much of this was tainted by the questionable decisions, communications, and conduct of CPS Rural Manager Robin Landry." Do you agree?

A. I can't argue with Judge Dobrescu. I wasn't at the hearing.

Q. As far as you understand, up to the time

that you left on the 25th, do you agree that what the judge said is true?

A. Yes.

MR. OHLSON: Can we take a little break?

(Break taken from 1:01 p.m. to 1:14 p.m.)

MR. OHLSON: Back on the record. Ms. Reporter, can the record reflect the time which we took our break?

The record should also reflect when we took our break, the witness retired with counsel privately.

BY MR. OHLSON:

Q. Sir, do you recall having a conversation on or about the 20th of April with a parent of a child at ALA, that parent being a person named David Hayes?

A. I don't recall that.

Q. See if this refreshes your recollection. Mr. Hayes was serving in the military and was In Germany at the time of the conversation. The call would have been to you, between you and him, he In Germany and you wherever you were on the 20th?

A. I don't recall the conversation.

Q. Do you recall having a telephone conversation with any parent during the time that