Case No. JV-0505028
Dept NO.2

IN THE JUVENILE DIVISION IN THE SEVENTH JUDICIAL DISTRICT COURT OF
THE STATE OF NEVADA, IN AND FOR THE COUNTY OF WHITE PINE

IN THE MATTER OF
CHRISTINA AUBUCHON; RACHAEL BARRAGAN;
OLIVIA BECKLEY;
NICHOLE BECKNER;
JOSHUA EDGAR BRANDT;
RIO BROWN;
MEGAN BURKHART;
CANDACE CAIN;
JOSEPH CANNON;
MATTHEW CANNON;
KRISTINA DEANNE DAHLBERG; MICHAEL DAMBACH;
MARI ELLA MARIE DANIELS; NICHOLE EICHMAN;
JOHNNY ALEXANDER GABELLIERI; RANDALL TIMOTHY GARDNER; CRYSTAL
MICHELLE HAYS;
VOL KILPATRICK;
JESSICA NICOLE LEAL; NICHOLAS ROBERT MELCHING; NICK MOORE;
RAMON ORTIZ;
SKYLAR ORTIZ;
LISA MARIE PHELPS;
BETHANY RANDAZZO;
JAMAL SALTER;
PRISILMA SERRANO;
KATRINA TAYLOR;
MALI CIA THATCHER;
JEANETTE CAMILLE TORPES; and KRISSY WONG,
                          ORDER REGARDING 72 HOUR HEARING
Minor Children Under Eighteen Years of Age.

## PROCEDURAL HISTORY

On May 1, 2005, child protective service employees took custody of

approximately thirty (30) minor children who were residing at Abundant Life Academy in

White Pine County, Nevada. A "72-hour" hearing was scheduled for May 3, 2005 at

3:00 p.m. By stipulation of counsel, the hearing was continued to May 10, 2005.

The Court received testimony on May 10, 2005, however, due to time

restraints, neither party was able to call all their witnesses. The parties agreed to

continue the hearing until May 31, 2005. The 72-hour hearing was then completed on

May 31 through June 2, 2005. Present at the hearing were representatives of

Abundant Life Academy, represented by Jeffrey J. Kump, Esq., and John Ohlson, Esq.,

CPS was represented by Kevin R. Briggs, Esq., Deputy District Attorney of White Pine

County, and the licensing bureau of the Nevada State Division of Child and Family

Services, represented by Karen Dickerson, Esq., Deputy Attorney General.

Both sides presented evidence and testimony and the matter was

submitted.

## FACTUAL SUMMARY

On April 20, 2005, the Child Protective Services ("CPS") section of the

Nevada State Division of Child and Family Services received an e-mail alleging various

problems at the Abundant Life Academy located in White Pine County, Nevada.

(State's Exhibit #1 ).

On April 21, April 23 and May 1, 2005, agency employees and others

visited the facility. On May 2, 2005, all children at the facility were taken into protective

Page -2

custody by CPS and placed at either the Nevada Youth Training Center in Elko or the

Caliente Youth Center in Caliente.

## DISCUSSION

Abundant Life Academy ("ALA") is a Christian based boarding school for

"unmotivated, gifted youth."1

A CPS worker may place a child into protective custody if he has

"reasonable cause to believe that immediate action is necessary to protect the child

from injury, abuse or neglect.2 NRS 4328.020(1) defines abuse or neglect as:

"(a) physical or mental injury of a non-accidental nature;
(b) sexual abuse or sexual exploitation; or
(c) negligent treatment or maltreatment as set forth in NRS
4328.140 of a child caused or allowed by a person
responsible for his welfare under circumstances which
indicate that the child's health or welfare is harmed or
threatened with harm."3

When CPS receives a report of abuse or neglect at a residential institution

it shall "ensure the safety of the alleged victims and of any other child who may be

threatened with harm.4 The central issue for the Court is whether or not there was

reasonable cause to believe immediate removal of the children from ALA was

necessary to protect the children from harm, abuse or neglect. The State presented

'Pursuant to NAC 4328.330, ALA would be deemed a Residential Institution.

2NRS 4328.390(1 )(a).

NRS 4328.140 provides that "negligent or maltreatment of a child occurs if the child is abandoned, is
without proper care, control and supervision or lacks the subsistence, education, shelter, medical care or
other care necessary for the well-being of the child. . ."

    4   N    A    C
4328.360(2).

0400000007010100030000000000

extensive testimony regarding the reasons for removal, which the Court will consider

separately and cumulatively. Based on the evidence and testimony presented, the

Court finds and concludes as follows:

### EDUCATION

The education program at ALA was provided by Willow Bend, which

apparently is in the business of supplying "home school" programs of instruction.

According to ALA representatives, parents were responsible for setting up an education

program for their children through Willow Bend. A teacher, Guy Gonder, was present at

the facility for varying amounts of time each week to assist students. ALA was not

certified by the Nevada Board of Education. Several students complained that they

were not progressing academically and some parents expressed the same concerns to

CPS workers.

Although some complaints were made regarding education, it is clear that

some students were progressing academically and an education program was in place.

Conflicting evidence was presented regarding the amount of time students

were allowed to study or complete school work. It is not clear that the alleged lack of

academic progress for some students was a result of actions by ALA or problems

inherent with the particular students.

At the hearing, great emphasis was placed on the fact that ALA was not certified by the Nevada Board of Education. This fact has virtually no relevance on the question of educational neglect and appears to be more of a licensing issue. Even if the allegations regarding the education program were true, such does not justify the

Page -4

4
0400000007010100030000000000

removal of the children to protect them from harm or injury.

## SEXUAL CONTACT

An allegation was made that a girl at ALA had a sexual relationship with

an ALA employee. CPS was told the employee was fired and then later re-hired due to

a shortage of staff. The girl denied any sexual relationship. It was not clear what role

the employee had after he was re-hired, whether he had contact with any students or

whether he was supervised himself.

Some boys made allegations that regular "masturbation contests" were

held. No staff was involved, nor did any staff observe such conduct. It appears that

when ALA staff learned of inappropriate conduct, efforts were generally made to correct

the problem. After CPS completed its interviews with children on May 1, 2005, the

unsubstantiated allegations regarding inappropriate sexual conduct did not form a basis

for removal of the children.

## LACK OF ADEQUATE SHELTER

This allegation primarily concerned the fact that seventeen (17) boys were

sleeping in a 40' x 10' or 40' x 12' office type mobile home. Some of the boys slept on

home made bunk beds that were considered "wobbly." Restroom facilities were not

available in the trailer but were located approximately 250 yards away. On April 21,

2005, an officer from the State Fire Marshall's office inspected the trailer and found the

lack of smoke detectors to be the most pressing deficiency. ALA was given twenty four

(24) hours to correct the problem with the smoke detectors and to submit a corrective

plan within thirty (30) days for other violations. The Fire Marshall did not order the boys

Page -5

`¯"
040000000701010003000000000

removed from the trailer. By May 2ND, ALA had complied with CPS orders to move the

boys out of the trailer and into cabins at the facility. The wobbly bunk beds had also

been stabilized.5

Based on the testimony provided, the Court finds that reasonable cause

did not exist to believe the removal of the boys was required due to inadequate shelter.

No evidence was presented at the hearing to support a finding that the girls shelter was

inadequate.

### CLOTHING

On April 21 and April 23, the children were wearing clean clothes. On

May 1 sᴛ and 2ND many of the children were wearing dirty clothes and some complained

about the lack of clean clothes. The evidence indicates that clothes were washed at a

location off site, and the on-going CPS investigation may have negatively impacted

ALA's ability to ensure all the children had clean
clothes.

In any event, the failure to supply clean clothes in this context does not

justify the removal of the children.

### MEDICAL NEGLECT

Allegations of medical neglect were made in both a general and a specific

sense. General allegations were that some children did not receive their medications

as prescribed. A copy of the medical log for the girls was admitted into evidence.

Assuming arguendo, that a notation was made on the log each time a medication was

dispensed, it would appear that some (but not all) of the girls were not receiving all

5What precipitated the relocation of the boys is discussed below.

Page -6

0400000007010100030000000000

medications in accordance with their prescriptions.

Mr. Rogers, the founder of ALA, testified that generally the children had

the right to refuse medications prescribed for asthma, ADHD, etc. A student of ALA,

Candace Cain, also testified that she had refused medications. No evidence was

presented as to what adverse effects would result from the failure to take Zoloft,

Adderall, Albuterol, or Zyrtec as prescribed. Without such information the Court cannot

speculate that these children were endangered by not taking their
medication.

Specific examples of alleged medical neglect were also presented. One

example concerned a girl who had lesions on her feet because she allegedly had not

seen a doctor or received medication for 1 ~ months. On cross examination however

it was learned that after this particular girl was taken into custody, she did not receive

any treatment because the girl said she didn't need immediate care. Clearly not a

situation that justified her removal from the program.

Another incident concerned a boy who claimed he was schizophrenic and

that he had not been given his medication.6 Because he did not receive his medicine,

the boy would hear voices at night. No evidence was presented as to how often this

occurred, if his medications were requested, or if staff was even notified. Mr. Rogers

specifically denied that a schizophrenic student was at ALA. Without some evidence

that ALA staff knew of this boy's condition or were responsible for his failure to take his

medication, it is difficult to blame ALA. Even if the Court were to assume, arguendo,

that a schizophrenic student was denied his medications by ALA staff on an on-going

6It is not clear whether he was refused his medication or whether he chose not to take it.

04000000070101000300000000000 04000000070101000300000000000
1
2 3 4 5 6 7 8

basis, it is too far a leap to find that all children (whether taking medication or not)

needed to be taken into protective custody.?

　　　　　The final specific incident of alleged medical neglect occurred while Robin

Landry and other CPS workers were actually at ALA on May 1, 2005. According to the

testimony presented, a girl at ALA was in extreme pain on May 1 ST and it was nearly

two (2) hours before an ALA staff member gave the girl her medication. According to

Mr. Cornell, a supervisor at ALA, on May 1, 2005, Ms. Landry caused ALA staff and

students to be separated. While Ms. Landry was conducting interviews, Mr. Cornell

overheard a walkie-talkie transmission that a particular girl was in pain. Mr. Cornell

inquired of Ms. Landry on at least two (2) occasions about the girl's need for

medications. According to Mr. Cornell, Ms. Landry said they (CPS) would be taking

Finally, while Ms. Landry was interviewing Mr. Cornell, a more

forceful demand for the medication was made over the walkie-talkie and Mr. Cornell

16 17 18 19 20 21
22 23 24 25 26

was then allowed to tend to the problem.

After observing the testimony of the witnesses and careful, consideration
of the content of the testimony, the Court finds Mr. Cornell's version of the incident to
be credible. To be specific, the Court finds that the actions of Ms. Landry were the
primary cause of the delay in responding to the girls need for medication.

Overall, the Court finds that the evidence presented to the Court did not
provide a reasonable cause to believe immediate removal was required to protect the
children from harm. Although the Court's decision is based on the findings detailed

7Such facts would certainly justify the removal of that child by CPS.

04000000070101000300000000000

above, a further comment is necessary regarding this case.

### THE CPS "INVESTIGATION"

Child Protective Services is charged with investigating allegations of abuse or neglect. The scope of an investigation into allegations of abuse or neglect is initially to determine whether there is reasonable cause to believe that immediate action is necessary to protect the child from injury, abuse or neglect. If reasonable cause to believe immediate action is necessary exists, the child may be taken into protective custody.

It is clear from the definition of "reasonable cause to believe" that the legislature intended that CPS consider information from all available sources while conducting an investigation. NRS 4328.121 (1) provides that a person

> "1. Has "reasonable cause to believe" if, in light of all the surrounding facts and circumstances which are known or which reasonably should be known to the person at the time, a reasonable person would believe under those facts and circumstances, that an act, transaction, event, situation or conditions exists, is occurring or has occurred."

Despite the clear mandate to investigate allegations of abuse or neglect, this case appears to be a situation where the actions of persons in positions of authority

improperly caused the removal of these children. It is the opinion of the Court that

much of the this case was tainted by the questionable decisions, communications and

conduct of the CPS Rural Manager, Robin Landry. After the first day of testimony

(which was provided exclusively by Ms. Landry), the evidence before the Court was

essentially as follows: CPS received allegations against ALA. On April 21, 2005, Ms.

Page -9

04000000070101000300000000000

Landry assembled a multi-disciplinary team to investigate the allegations. The team

included a Fire Marshall, a licensing worker, a health division worker, two (2) social

workers, law enforcement officers and the Elko District Office Manager of CPS, Larry

Robb.

After the investigation on April 21, Mr. Robb informed Ms. Landry that

seve.nteen (17) boys at ALA were living in a trailer and the Fire Marshall gave ALA

twenty four (24) hours to get the boys out of the trailer. According to Ms.
Landry, she

told Mr. Robb that the boys must be removed from the "gutted out" trailer immediately,

but the boys could stay in another trailer, cabins or the lodge located on the site.

Mr. Robb also reported to Ms. Landry the children complained that telephone

calls with parents were terminated if negative statements were made, there was a

container of gasoline at the site, and cleaning solutions were stored next to food.

Based on this information Ms. Landry ordered the team to return on April 23 to continue

the investigation.

On April 23, 2005, CPS staff members returned to ALA and discovered

that the boys were no longer on site. In Ms. Landry's opinion, ALA was then interfering

with a CPS investigation.

On April 24, 2005, social worker Tina Slaughter responded to a dispatch

report that a 911 call had been made from the Sunnyside Youth Camp and found that

the boys from ALA were at the Sunnyside Youth Camp (which is located in Nye

County). Upon learning of the situation, Ms. Landry told Larry Robb to instruct ALA

staff to return the boys to the ALA site. ALA staff complied with the request

Page -10
040000000
701010003
000000000

0

On May 1, 2005, Ms. Landry went to the ALA Facility with various other Division of Child and Family Service's employees. Interviews were conducted with staff and students and on May 2, 2005, the children were taken into protective custody.

After observing the testimony of all the witnesses presented during the four (4) day hearing, and reviewing the transcripts and exhibits, the Court finds that the "rest of the story" is as follows:

On April 20, 2005, social worker Tina Slaughter was told by Larry Robb to take all the children from ALA into protective custody.8 Apparently, this directive came from Ms. Landry. When Ms. Slaughter told Detective Martin Sorenson of her objective, Detective Sorenson, Sheriff Bernie Romero and District Attorney Richard Sears all advised Ms. Slaughter that she needed to conduct an investigation before any removal.9 A team was then assembled to conduct the "investigation."

Prior to the CPS visit on April 21, 2005, the licensing bureau had prepared a cease-and-desist order that was served on ALA on April 21, 2005. Contrary to what Larry Robb told Ms. Landry, the Fire Marshall did not give ALA twenty four (24) hours to move the boys out of the trailer, rather, the Fire Marshall gave ALA twenty four (24) hours to install smoke detectors in the boys trailer.10

When Larry Robb spoke to Craig Rogers about removing the boys from

Transcript p. 240-242. The Court finds Ms. Slaughter's testimony to be credible and she is commended
for her honesty in spite of the damaging nature of her testimony.

9Id. p. 240-242.

10Defendant Exhibit L.

Page -11

/

the trailer, Mr. Rogers reasonably believed Mr. Robb meant the boys were to be

removed from the ALA site, and Mr. Rogers complied. The Court finds Mr. Roger's

testimony about his efforts to relocate the boys to be particularly credible. Thus, the

removal of the boys on April 23 was not an effort to obstruct the investigation, but rather

an effort to comply with orders given by Mr. Robb.

As a result of the on-site investigations of April 21 and April 23, the

investigating social workers and law enforcement officer found no basis or need to

remove any of the children. As of May 1, 2005, the boys had been relocated into

cabins at the ALA site.

Although Ms.Landry received a report of sexual contact between a Student and staff
on April 28, 2005, she did not discuss the matter with ALA staff on May 1 or
May 2. Ms. Landry did discuss the matter with the girl allegedly involved, and the
girl denied any sexual contact.

Ms. Landry made no efforts to address medical neglect concerns with Dr.

Crouch, who she was told was on-site three (3) days per week.

Ms. Landry made no efforts to address educational neglect issues with

\Guy Gonder or Willow Bend, nor did she speak to any ALA staff about their

qualifications as educators.

Despite Ms. Landry's claims that CPS was unconcerned with licensing

issues, it is clear that licensing was an issue and possibly an important factor in the

Page -12

seizure of the children.

11

The Court is cognizant of the fact that CPS provides a vital function in its

efforts to protect children. The task is a difficult one and in close cases there is a

natural tendency to remove a child rather than risk harm. This case however, appears

to be one in which the decision to close ALA was made prior to any investigation, and

once the local investigators were unable to find evidence to support a finding of an

 immediate need to remove, the rural regional manager took it upon Herself to take over

 the investigation. It appears the focus was then to find grounds to

 remove the children.

12     Based on the foregoing, the Court finds that a reasonable belief that

immediate removal of the children was necessary to protect them did not exist on May1 ST
or May 2ND, 2005.

DATED this 25TH day of AUGUST, 2005

 DISTRICT COURT JUDGE .

18

19  Ms. Landry mentioned licensing issues several times during her direct examination. In addition, the
cease-and desist order was prepared prior to the first day of the "investigation" but not served until it was
20  clear the children would not be removed; licensing representatives were present at the site and actively
21  involved in the\ifivestlgation-on April 21; licensing representatives were also present on May 1 and May

22  2; and licmeAsirlf:fwas,also represented by counsel at all four (4) days of the 72 hour hearing.

b 'nn;., J,;')'- ,.) v:. ".: ~. . '
1i.{.::.;.it~o '{rt! n~JlO~~fl to ;.}.'~ -" .
23  The
Couft:also':notes'thatthetestini-ony
regarding "cumulative concerns" of
24  CPS workers supports the

25

26  conq6ut},9\Jr[th@.~jttiE?tfocuswas to!ind anything to support the removal of the children. For example,
workers were conC,erned;about K!1ives in the kitchen; the possibility that children helping in the kitchen
did not'washtheir hands; the existence of cooking alcohol in the kitchen; the suggestion that the girls did not have
underwear because no panty lines were observed; the location of gas cans near a building; the existenc.e.9fcan old
cabin with sharR m~tannear it; the condition of the bus used to transport the boys; the
lack of altdri'i've'rw1fflEnx)mmercTaidriver's license; the termination of telephone calls with students who
make negative comments to their parents or about the program; and the odor of sewer at the facility.

Page -13

CERTIFIED COPY
The document to which this certificate is
attached is a full, true and correct copy of
the original on file and of record in my office.
DATE: _____6/11/07_____
DONNA M. BATH, Clerk of the Seventh
Judicial District Court in and for the County of
White Pine, State of Nevada.

By_____Campbell_____Deputy