1

2

3

4

5

6                          UNITED STATES DISTRICT COURT

7                                DISTRICT OF NEVADA

8                                        * * *
                                          )
9    DAVID BARRAGAN, et al.,               )
                                          )              03:06-CV-00310-LRH-VPC
10                  Plaintiffs,            )
                                          )
11   v.                                   )
                                          )              ORDER
12   ROBIN LANDRY, Individually, and as an )
     employee of the Division of Child Protective )
13   Services of the State of Nevada and agency of )
     the STATE OF NEVADA existing under the )
14   laws of the STATE OF NEVADA, County of )
     WHITE PINE; THE STATE OF NEVADA; )
15   and DOES I-X, inclusive,             )
                                          )
16                  Defendants.           )
                                          )
17   _____)

18          Presently before the court is Plaintiffs' partial motion for summary judgment (#61[1]).

19   Defendants Robin Landry and the State of Nevada have filed an opposition (#63) to which

20   Plaintiffs have replied (#70).  Also before the court are Defendants' two cross-motions for

21   summary judgment (#74, #80).  Plaintiffs have filed oppositions to these motions (#79, #86).

22   ///

23   ///

24   ///

25

26          [1] Refers to the court's docket number.

1    **I.      Facts and Procedural History**

2          This matter concerns claims brought by twenty-four plaintiffs, who consist of minors

3    (collectively "Minor Plaintiffs") and their parents or representatives (collectively "Parent

4    Plaintiffs").  Viewing the evidence in the light most favorable to Plaintiffs, the following narrative

5    describes the facts of this case.

6          Defendant Robin Landry is employed by the Division of Child and Family Services

7    ("DCFS") as a Rural Regional Manager.  (Aff. of Landry (#80), Ex. 1 ¶ 5.)  Minor Plaintiffs were

8    boarding students at Abundant Life Academy ("ALA").  (First Am. Compl. (# 2) ¶ 16.)  ALA is a

9    Christian-based boarding school for "unmotivated, gifted youth," which was located in White Pine

10   County, Nevada.  *Id.* ¶¶ 5, 7.  As of April 20, 2005, ALA was not operating under a valid child care

11   license.  *See* (Dep. of Paula Hawkins (#86) at Ex. C.)

12         On April 20, 2005, Child Protective Services ("CPS") of DCFS, received notice of

13   problems at ALA.  (Aff. of Tina Slaughter (#80), Ex. 2 ¶ 5.)  The notification came from a parent

14   whose daughter was previously boarded at ALA.  *Id.*  The parent alleged that (1) the children at

15   ALA were sexually active with one another and staff members, (2) there was lack of supervision

16   and medical care, (3) the children were being neglected educationally, and (4) there were

17   approximately fifteen to seventeen boys housed in a trailer at ALA.  (Aff. of Landry (#80), Ex. 1 ¶

18   7; *see also* Aff. of Slaughter (#80), Ex. 2 ¶ 5.)  Landry learned of these allegations during a staff

19   meeting in Fallon, Nevada.  *Id.* ¶ 9.

20         At this meeting, the DCFS rural mangers discussed a need to investigate ALA.  *Id.*  Also,

21   Larry Robb and Landry contacted other DCFS directors, to inquire about temporary housing for the

22   ALA children in the event DCFS needed to remove them.  (Dep. of Robb (#86), Ex. D at ll. 13-23.)

23   Before DCFS conducted any investigation, it contacted Detective Sorenson in an effort to acquire

24   his assistance in removing the children from ALA.  (Test. of Sorenson (#86), Ex. E.)  Because

25   DCFS had not conducted an investigation, Sorenson declined to assist at that time.  *Id.*

26                                                      2

1      On or about April 21, April 23, and May 1, 2005, DCFS employees and others visited the

2  facility.  (First Am. Compl. (# 2) ¶ 8.)  Paula Hawkins, an employee of the DCFS licensing bureau,

3  was directed to draft a "cease and desist" letter, which she delivered to ALA on April 21, 2005.

4  (Aff. of Landry (#80), Ex. 1 ¶ 12; *see also* Dep. of Hawkins (#86) at Ex. C.)  DCFS sent the letter

5  because of ALA's lack of a child care license.  (Notice of Cease and Desist (#80), at Ex. 4.)

6      After the April 21st  investigation, Robb reported to Landry that the investigation team was

7  unable to interview the children outside the presence of ALA supervisors.  (Aff. of Landry (#80),

8  Ex. 1 ¶ 13).  Robb also reported that some of the boys wanted to leave ALA for the alleged reason

9  that the staff monitored calls between students and their families to ensure the students did not

10  report anything negative.  (Aff. of Lawler (#80), Ex. 3 ¶ 7.)  Additionally, the boys' (seventeen in

11  number) sleeping arrangements were crowded and hazardous, as the "gutted out" trailer where they

12  were housed lacked a smoke alarm.[2]  (Aff. of Landry (#80), Ex. 1 ¶ 13.)  Robb further reported that

13  the trailer was located a distance from the main house and was without electricity, running water, or

14  lavatories.  *Id.* ¶ 13.  As a result, Robb directed ALA to move the children to a safer location

15  immediately–at least until smoke alarms were installed.  *Id.* ¶ 14.

16      Upon this directive, that night ALA removed the boys from Hidden Canyon Ranch to Sunny

17  Side Ranch.  (Dep. of Craig Rogers (#79) at Ex. A.)  Due to the move, one boy (David Svoboda),

18  became frightened and lit a rag on fire in order to set off the fire alarm.  (Dep. of Tracy Svoboda

19  (#79), Ex. B at 31-33.)  This was apparently done in an effort to obtain help.  *Id.*  As a result, the

20  boy was arrested by police and detained in a Tonopah juvenile detention center.  *Id.* at 34.

21      The investigation team returned on or about the following Saturday, April 23, 2005, to

22  continue investigating ALA and interviewing the children.  *Id.* ¶ 15.  Upon their return, Robb

23  discovered the boys were not at the ALA facility; thus, Defendants were unable to complete the

24

25      [2] Because the trailer lacked a smoke alarm, the fire marshall found this a violation of fire codes and
gave ALA twenty-four hours to install a smoke alarm.  (Aff. of Landry (#80), Ex. 1 ¶ 14.)

26

1    investigation.  *Id.* ¶ 16.

2          On April 28, 2005, Jerolyn Tennyson, a social work supervisor for DCFS who was not

3    directly involved in ALA's investigation, received a telephone call from a former employee of

4    ALA.  (Aff. of Tennyson (#80), Ex. 5 ¶ 6.)  The former employee expressed some ethical concerns

5    about the ALA program.  *Id.* ¶ 7.  These concerns included the following: (1) vehicles used at the

6    facility had been made to look as though they were properly licensed by using "false stickers"; (2)

7    an ALA employee who drove the children did not have a driver's license and had been recently

8    convicted of a DUI; (3) one staff member was terminated for having a sexual relationship with a

9    student, but he was later rehired for lack of staffing; the staff member continued the relationship

10   and was terminated a second time; (4) the staff to student ratio was inadequate, resulting in lack of

11   supervision; (5) children were engaging in sexual activity with one another, and there were reports

12   of girls being taken to a physician for pregnancy checks; and (6) background checks were not a part

13   of the hiring process; and (7) one staff member had warrants out for his arrest.  *Id.*  On April 29,

14   2005, Tennyson participated in a strategy meeting concerning the ALA investigation.  *Id.* ¶ 8.

15         On or about May 1, 2005, the investigation team, absent Robb but including Landry, went

16   to ALA and interviewed the staff and children.  (Aff. of Landry (#80), Ex. 1 ¶¶ 28, 29.)  The

17   following information was obtained during that investigation:

18   •      "The boys did not have adult supervision," and while "there were older boys who were

19          group leaders . . . they were just kids not adults."  (Aff. of Slaughter (#80), Ex. 2 ¶ 11.)

20   •      There was "no awake staff 24 hours per day."  (Aff. of Landry (#80), Ex. 1 ¶ 32.)

21   •      A staff member had "kicked [a minor] in the 'nuts' with his knee."  (Aff. of Lawler (#80),

22          Ex. 3 ¶ 21.)

23   •      Some of the girls reported that they would sneak out at night to see the boys.  (Aff. of

24          Norton (#80), Ex. 6 ¶ 10.)

25   •      An ALA staff member,  who was also an ALA graduate, stated he "was or had been

26                                          4

1    sexually active with one of the girls." (Aff. of Landry (#80), Ex. 1 ¶ 37.)

2    •    An ALA staff-interviewee appeared to be intoxicated. *Id.*

3    •    Male students were acting out sexually by engaging in group masturbation contests and by

4         "making advances toward other youths including attempts to 'mount' male students for

5         purposes of sexual acts." (Aff. of Lawler (#80), Ex. 3 ¶ 24.)

6    •    The ALA's medicine box was disorganized and unlocked. (Aff. of Landry (#80), Ex. 1 ¶

7         32.)

8    •    The medical log had not been updated for several weeks; and an interviewee was unable to

9         confirm whether the children were receiving their medications, even though the interviewee

10        was responsible for medication distribution. *Id.*

11   •    One child-interviewee indicated he did not take his medication for his schizophrenia

12        episodes. (Aff. of Lawler (#80), Ex. 3 ¶ 15.)

13   •    The children reported they did not always receive their medications, and some stated they

14        had been taken off their prescription medications. (Aff. of Norton (#80), Ex. 6 ¶¶ 8, 9.)

15   •    People with no medical training were dispensing prescription medications. (Aff. of Tuso

16        (#80), Ex. 7) ¶ 25.)

17   •    ALA did not have a qualified mental health professional on staff. (Aff. of Norton (#80),

18        Ex. 6 ¶ 11.)

19   •    After Landry finished interviewing the children, several of them asked her when she would

20        be returning for them. (Aff. of Landry (#80), Ex. 1 ¶ 36.)

21        When the team returned to its Ely office that night, they discussed their interviews and all

22   concluded that the "allegation of neglect as a result of lack of supervision against ALA was

23   substantiated according to the Guidelines for Substantiation Child Protective Service Referrals."

24   (Aff. of Lawler (#80), Ex. 3 ¶ 23.)  Landry determined the children should be removed from ALA.

25   (Aff. of Landry (#80), Ex. 1 ¶ 38.)

26                                                5

1   The next morning, on or about May 2, 2005, Slaughter was directed to contact White Pine
2   law enforcement to accompany the team to ALA in order to remove the children.  (Aff. of Landry
3   (#80), Ex. 1 ¶ 39.)  Detective Sorenson participated in this removal.  *Id.* ¶ 41.

4   The boys were taken from ALA and transported to the Nevada Youth Training Center
5   ("NYTC").  *Id.* ¶ 49. The girls were taken to Caliente Youth Training Center ("CYTC").  *Id.*; *see*
6   *also* (First Am. Compl. (# 2) ¶ 10.)  The children were housed separately from NYTC's and
7   CYTC's general populations.  (Aff. of Slaughter (#80), Ex. 2 ¶ 19; Aff. of Deborah Norton (#80),
8   Ex. 6 ¶ 24.)  Tennyson assisted in arranging for DCFS staff to supervise the children upon their
9   arrival at NYTC and CYTC.  (Aff. of Tennyson (#80), Ex. 5 ¶ 10.)  By May 5, 2005, all of the
10  children had been returned to their parents or otherwise placed by their parents in another facility.
11  (Aff. of Landry (#80), Ex. 1 ¶ 49.)

12   As a result of the removal and pursuant to Nevada Revised Statutes section 432B.470, a
13  seventy-two hour hearing occurred with Judge Dobrescu of the Seventh Judicial District Court of
14  Nevada, White Pine County, presiding.  (Aug. 25, 2005 Order (#61), Ex. D.)  As a result of the
15  hearing, Judge Dobrescu found that there was no reasonable cause to remove the children.  *Id.* at
16  22.

17   Plaintiffs presently seek partial summary judgment on grounds of collateral estoppel.  In
18  addition, Defendants move for summary judgment as to all of Plaintiffs' claims.  The court will
19  address the parties' motions and arguments below.

20  **II.   Legal Standard**

21   Summary judgment is appropriate only when "the pleadings, the discovery and disclosure
22  materials on file, and any affidavits show that there is no genuine issue as to any material fact and
23  that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In assessing a
24  motion for summary judgment, the evidence, together with all inferences that can reasonably be
25  drawn therefrom, must be read in the light most favorable to the party opposing the motion.

26                                                     6

1  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne*

2  *v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

3       The moving party bears the burden of informing the court of the basis for its motion, along

4  with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*,

5  477 U.S. 317, 323 (1986).  On those issues for which it bears the burden of proof, the moving party

6  must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could

7  find other than for the moving party."  *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.

8  1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).

9       In order to successfully rebut a motion for summary judgment, the non-moving party must

10  point to facts supported by the record which demonstrate a genuine issue of material fact.  *Reese v.*

11  *Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000).  A "material fact" is a fact "that might

12  affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

13  242, 248 (1986).  Where reasonable minds could differ on the material facts at issue, summary

14  judgment is not appropriate.  *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983).  A dispute regarding

15  a material fact is considered genuine "if the evidence is such that a reasonable jury could return a

16  verdict for the nonmoving party."  *Liberty Lobby*, 477 U.S. at 248.  The mere existence of a scintilla

17  of evidence in support of the plaintiff's position will be insufficient to establish a genuine dispute;

18  there must be evidence on which the jury could reasonably find for the plaintiff.  *See id.* at 252.

19  **III.    Discussion**

20       **A.  Plaintiffs' Partial Motion for Summary Judgment**

21       Plaintiffs argue that the doctrine of collateral estoppel prevents Defendants from relitigating

22  whether Defendant Landry had reasonable cause to remove Minor Plaintiffs from ALA.  (Pls.' Mot.

23  for Summ. J. (#61) at 5-9.)  Plaintiff base this argument upon Judge Dobrescu's findings that there

24  was no reasonable cause to remove the children.  *Id.*  Defendants' opposition asserts collateral

25  estoppel is inapplicable because Defendants did not have a full and fair opportunity to litigate the

26                                                    7

1   factual issues at stake in the Dobrescu hearing.  (Defs.' Opp'n to Mot. for Summ. J. (#70) at 2.)

2   Defendants also argue Plaintiffs have a greater burden of proof in this case and that Landry was not

3   a party or in privity with a party at Judge Dobrescu's hearing.

4         Under the doctrine of collateral estoppel–or issue preclusion–a party may be barred from

5   relitigating an issue of fact or law that was previously decided in a different case.  *Allen v. McCurry*,

6   449 U.S. 90, 94 (1980).  "[A] federal court must give to a state-court judgment the same preclusive

7   effect as would be given that judgment under the law of the State in which the judgment was

8   rendered."  *Migra v. Warren City Sch. Bd. of Educ.*, 465 U.S. 75, 81 (1984).  Offensive use of

9   collateral estoppel, distinguishable from defensive collateral estoppel, occurs when a plaintiff seeks

10  to estop a defendant from relitigating issues the defendant previously and unsuccessfully litigated

11  against a plaintiff.  *Parklane Hoisery Co., Inc. v. Shore*, 439 U.S. 322, 329 (1979).

12        Nevada courts may apply collateral estoppel if (1) the issue decided in prior litigation is

13  identical to the issue presented in the current litigation; (2) the initial ruling was on the merits and is

14  final; and (3) the party against whom the judgment is asserted was a party or in privity with a party

15  to the prior litigation.  *La Forge v. State, Univ. & Community College Sys. of Nev.*, 997 P.2d 130,

16  133 (Nev. 2000).

17        The court finds Defendant Landry was not a party in privity to the Dobrescu hearing, and

18  therefore Plaintiffs may not successfully assert collateral estoppel in this case.  The Nevada Supreme

19  Court has held that only parties to the former judgment or their privies, "may take advantage of or be

20  bound by [a prior judgment]."  *Paradise Palms Cmty. Ass'n v. Paradise Homes*, 505 P.2d 596, 598

21  (Nev. 1973).  "A party in this connection is one who is 'directly interested in the subject matter, and

22  had a right to make defense, or to control the proceeding, and to appeal from the judgment.'"  *Id.*

23        Although Defendant Landry's actions and decisions were discussed during the Dobrescu

24  hearing, Landry was not a party to that proceeding.  (Aug. 25, 2005 Order (#61) at Ex. D.)  The

25  subject matter of the hearing concerned the interests of the ALA children.  Hence, Landry was not

26

1  directly interested in the subject matter of this proceeding.  The Attorney General did not represent

2  Landry, Landry was neither entitled to conduct discovery nor permitted to present a defense for

3  herself, and she did not have a right to control the proceeding.  Furthermore, because Landry was

4  not a party to the proceeding, she was unable to appeal Judge Dobrescu's judgment.  As a result,

5  Landry did not stand in privity with the parties at the Dobrescu hearing.  Therefore, offensive

6  collateral estoppel is inapplicable, and Plaintiffs' motion for summary judgment is denied.

7        **B.  Defendants' Motion for Summary Judgment**

8         As an initial matter, Defendants argue DCFS must be dismissed because it is an entity of

9  the state and therefore incapable of being sued pursuant to 42 U.S.C. § 1983.  Defendants further

10  contend they are entitled to summary judgment because Plaintiffs are unable to prove a violation of

11  the Fourth or Fourteenth Amendment.  Alternatively, Defendants move for summary judgment on

12  the ground Defendant Landry is entitled to qualified immunity.  The court will address each

13  argument in turn.

14        **1.    The State of Nevada and DCFS's Capacity to Be Sued**

15        Defendants argue the State of Nevada and DCFS must be dismissed from this lawsuit

16  because "[n]either a State [n]or its officials acting in their official capacities are 'persons' under

17  § 1983."  (Defs.' Mot. for Summ. J. (#80) at 10.)  The court agrees.

18        The Supreme Court has held that under 42 U.S.C. § 1983, neither a state nor its officials

19  acting in their official capacities are considered a "person."  *Will v. Mich. Dep't of State Police*, 491

20  U.S. 58, 71 (1989) (citations omitted).  Likewise, "governmental entities that are considered 'arms

21  of the state' for Eleventh Amendment purposes are not persons within the meaning of § 1983."  *Id.*

22  at 70.

23        In light of the Supreme Court's ruling in *Will*, neither the State of Nevada nor DCFS are

24  considered "persons" under § 1983.  Therefore, the court grants Defendants' motion to dismiss the

25  State of Nevada and DCFS from this action.

26                                  9

### 2.    Violations of § 1983

Plaintiffs' complaint and opposition to Defendants' motion for summary judgment appear to assert causes of action pursuant to 42 U.S.C. § 1983 for infringement of Plaintiffs' Fourth and Fourteenth Amendment rights.  Specifically, Plaintiffs allege Landry unreasonably seized Minor Plaintiffs and interfered with Parent Plaintiffs' freedom of personal choice in family matters, as afforded by the Due Process Clause. (Pls.' Opp'n to Mot. for Summ. J. (#86) at 10-11.)  Defendants argue Plaintiffs' Fourth and Fourteenth Amendment rights were not violated because Landry had reasonable cause to believe the children were in immediate danger and thus removed them pursuant to her statutory obligations.  (Defs.' Mot. for Summ. J. (#80) at 10-11.)  Defendants also argue Plaintiffs have failed to present any evidence in opposition to this conclusion.  Accordingly, Defendants maintain Plaintiffs have failed to create a genuine issue of material fact for trial.  *Id.*

In order to survive summary judgment concerning a 42 U.S.C. § 1983 violation, a plaintiff must present evidence showing that (1) the complainant has been deprived of a right "secured by the Constitution and the laws" of the United States and (2) the action complained of was committed by a person acting under color of state law. *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156-57 (1978); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970).

#### i.    *4th Amendment Seizure*

The Fourth Amendment to the United States Constitution grants people the right to be secure in their persons against unreasonable seizures.  U.S. Const. Amend. IV.  This court's prior order regarding Defendants' motion to dismiss applied the standard articulated in *Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 2002), for its Fourth Amendment analysis.  Accordingly, the law of the case doctrine provides this analysis is similarly applicable for Defendants' motion for summary judgment.  In *Wallis*, the Ninth Circuit dealt with a state's seizure of a child for Fourth Amendment purposes.  The court held:

> Officials may remove a child from the custody of its parent without  prior judicial authorization only if the information they possess at the time of the seizure is such as

> provides reasonable cause to believe the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.

*Id.* at 1138.  Absent reasonable cause under these circumstances, the state will be in violation of the Fourth Amendment.  *Id.*

Generally, whether reasonable cause existed at the time of the seizure is a question of fact. *Id.*  Furthermore, in the context of child abuse or neglect, a state's belief will not be reasonable unless a reasonable investigation takes place before the seizure–particularly in circumstances where it is unclear whether a crime has been, or will be, committed.  *Id.*; *see also Sevigny v. Dicksey*, 846 F.2d 953, 957 (4th Cir. 1988).  Whether a reasonable investigation has taken place depends on time constraints and the nature of the allegations.  *Id.*  Thus, summary judgment is not appropriate if:

> A material question of fact exists regarding whether (1) there was reasonable cause to believe, on the basis of the information in the possession of the [officers], that the [] children faced an immediate threat of serious physical injury or death; or (2) the actions taken by the officers–removing the children from their [custodians] and placing them in an institution–exceeded the permissible scope of the action necessary to protect them from that immediate threat.

*Id.*  However, when viewing the evidence in a light most favorable to a plaintiff, it is apparent that no reasonable jury could find a plaintiff's constitutional rights were violated, summary judgment in favor of the defendant is proper.  *Id.*

### a.     Plaintiffs Mescher and Svoboda

Defendants' initial motion for summary judgment (#74) was made with regard to Plaintiffs Mescher and Svoboda.  Defendants maintain they are entitled to summary judgment because while Plaintiffs' claims are "based on the allegedly wrongful removal of their children from ALA," Defendants did not remove David Svoboda or Adam Mescher.  (Defs.' Mot. for Summ. J. as to Pls. Mescher & Svoboda (#74) at 3.)  In response, Plaintiffs contend it was Defendants who "set a series of events in motion which caused [Adam Mescher] to be . . . arrested, jailed, and adjudicated" and that Defendants "assumed custody of [David Svoboda], only relinquishing him to his parents on their affirmation that they would not educate their child with ALA any more."  (Pls.' Opp'n to

1  Defs.' Mot. for Summ. J. as to Pls. Mescher & Svoboda (#79) at 4.)

2      It is apparent form the evidence that no seizure of Minor Plaintiffs occurred.  *See United*

3  *States v. Drayton*, 536 U.S. 194, 201 (2002) (stating that "[i]f a reasonable person would feel free to

4  terminate the encounter, then he or she has not been seized" for Fourth Amendment purposes).  It is

5  undisputed Defendants did not remove Minor Plaintiffs Mescher and Svoboda from ALA.

6  Plaintiffs admit that David Svoboda was neither removed nor taken into the custody of Defendants.

7  (Req. for Admis. (#74), Ex. 1 at Nos. 1, 2.)  Further, Parent Plaintiffs Scott and Karen Mescher state

8  in their depositions that Defendants did not take Adam Mescher into custody.  (Dep. of Karen

9  Mescher (#74), Ex. 2 at 34:1-3, 35:2-8; *see also* Dep. of Scott Mescher (#74), Ex. 3 at 67:10-12,

10  76:17-19.)

11      Still, Plaintiffs argue it was Defendants' actions that caused David Svoboda to be arrested

12  and detained by police officers.  (Pls.' Opp'n to Defs.' Mot. for Summ. J. as to Pls. Mescher &

13  Svoboda (#79) at 4.)  Such events, however, are too attenuated to be attributed to Defendants.  And,

14  although Plaintiffs claim Adam Mescher was "temporarily detained," (Pls.' Opp'n to Mot. for

15  Summ. J. (#79) at 2), they fail to cite to any evidence to support this proposition.

16      In short, Plaintiffs failed to rebut Defendants' showing that Minor Plaintiffs Mescher and

17  Svoboda were not removed from ALA.  Consequently, because Plaintiffs have not shown Minor

18  Plaintiffs were seized in any other fashion, Defendants' motion for summary judgment as to

19  Plaintiffs Mescher and Svoboda's Fourth Amendment claim is granted.

20              **b.    The Remaining Plaintiffs**

21      Defendants maintain they had reasonable cause to believe that removal of the ALA children

22  was necessary to protect them from abuse and neglect.  (Defs.' Mot. for Summ. J. (#80) at 11.)

23  Plaintiffs respond by arguing that because Defendant Landry had "conceived and executed a plan

24  for the removal of [] Plaintiffs from ALA both before and regardless of the outcome of the CPS

25  investigation," Defendant Landry lacked reasonable cause to remove the children.  (Pls.' Opp'n to

26                                    12

1  Defs.' Mot. for Summ. J. (#86) at 8.)  Even if Defendant Landry had a preconceived plan to remove

2  the children from ALA, Plaintiffs have failed to rebut Defendant Landry's showing the she had

3  reasonable cause to remove Minor Plaintiffs.

4  　　　While Plaintiffs present evidence indicating Tina Slaughter had contacted Detective

5  Sorenson to get assistance in removing the children prior to any investigation of ALA, this evidence

6  does not demonstrate Defendants' later investigations were unreasonable or insufficient to establish

7  reasonable cause.  To the contrary, it is undisputed that Defendants twice went to ALA and spoke

8  with its students and staff members in addition to observing the facility's conditions.  *See* (First Am.

9  Compl. (#2) ¶ 8; Aff. of Landry (#80), Ex. 1 ¶¶ 13-16.)  During these investigations, DCFS staff

10 observed the students' sleeping arrangements and general living conditions.  The DCFS staff also

11 interviewed ALA staff concerning ALA protocol and interviewed students regarding their

12 experiences at ALA.  *See* (Aff. of Landry (#80), Ex. 1 ¶¶ 13, 14, 28, 29, 32.)  In view of the scope of

13 information Defendants received by visiting the ALA facility, Defendants' investigations were

14 reasonable.

15 　　　Furthermore, the undisputed evidence indicates that, not only Defendant Landry, but other

16 DCFS staff felt that the information they received from the investigations gave them reasonable

17 cause to believe the children were in imminent threat of serious bodily injury.  The allegations

18 presented to Slaughter by a former ALA student's parent included accusations that the students

19 were unsupervised and were neglected to the point they were able to be sexually active with one

20 another and ALA staff members.  (Aff. of Slaughter (#80), Ex. 2 ¶ 5; Aff. of Landry (#80), Ex. 1 ¶

21 7.)  This parent also reported that there was a lack of medical care.  *Id.*  These allegations alone

22 raised grave concerns that the children were neglected.  As one should anticipate, DCFS properly

23 conducted an investigation of ALA in order to further establish whether they had reasonable cause

24 to remove the children.

25 　　　Upon investigation of ALA, DCFS staff discovered evidence that substantiated the parent's

26

13

report.  Robb reported that the male students were housed in a "gutted out trailer"; and seventeen of them slept in bunk beds that were "butted up against one another."  (Aff. of Landry (#80), Ex. 1 ¶ 13.)  Furthermore, the trailer lacked a smoke alarm, electricity, and running water.  *Id.*  In light of these circumstances, the boys' housing conditions were hazardous to their safety–especially in the event of an emergency.

What is more, after the initial investigation, DCFS received yet another complaint about the ALA facility, this time from someone with personal knowledge–a former ALA employee.  (Aff. of Tennyson (#80), Ex. 5 ¶ 6.)  This report substantiated the prior complaint and expressed more concerns about the ALA children's safety.  The former employee reaffirmed the allegation that the children were unsupervised, they were sexually active with one another and staff, and there were even pregnancy issues.  (Aff. of Tennyson (#80), Ex. 5 ¶ 6.)  The former employee also reported that one staff member with driving responsibilities did not have a driver's license and had recently been convicted of a DUI, while another employee had outstanding warrants for his arrest.  *Id.*  Thus, Defendants' belief that the ALA children were in danger of imminent harm was further substantiated.

Even putting these initial reports and observations aside, Defendants' findings based on the May 1, 2005, investigation alone is sufficient to show that Defendants had reasonable cause to believe the ALA children were in imminent danger of serious bodily injury.  Slaughter reported that upon questioning the ALA staff, she discovered the children were not supervised twenty-four hours a day.  (Aff. of Slaughter (#80), Ex. 2 ¶ 11.)  Thus, the children were able to "sneak out" at night. *See* (Aff. of Norton (#80), Ex. 6 ¶ 11.)  Notably, when Defendants interviewed a former ALA graduate and staff member, he stated that he was or had been sexually active with one of ALA's female students.  (Aff. of Landry (#80), Ex. 1 ¶ 37.)  Defendants also believed this interviewee was intoxicated.  *Id.*

Moreover, DCFS staff observed the children's medicine was unorganized in an unlocked

14

1   box.  (Aff. of Landry (#80), Ex. 1 ¶ 32.)  Some of the medications were missing labels, and a
2   medical log had not been updated for several weeks.  *Id.*  Remarkably, the interviewee in charge of
3   dispensing the medications did not have any medical training and was unable to confirm whether
4   the children were receiving their prescription medicines.  *Id.*; *see also* (Aff. of Tuso (#80), Ex. 7 ¶
5   25.)  Student-interviewees reported they did not always receive their medicine.  *Id.*

6   One child complained he would not receive his medications unless he remembered to
7   remind the staff to give it to him; he also stated he could not remember to do this most of the time.
8   (Aff. of Lawler (#80), Ex. 3 ¶15.)  There is evidence that this particular student suffers from
9   schizophrenia and has "episodes" where he hallucinates and hears voices when he does not take his
10  medication.  *Id.*  ALA also did not have a qualified health professional on staff.  *See id.* ¶ 11.

11  In sum, Defendants presented a plethora of evidence, which remains undisputed, to show
12  that it was objectively reasonable to remove the children from ALA: (1) the boys' housing
13  conditions were substandard–as indicated by the fire marshall's mandate that ALA install a smoke
14  detector within twenty-four hours, (2) the children were acting out sexually with one another, (3)
15  staff were engaging in sexual activity with the children, (4) the children had access to prescription
16  medication, and (5) the staff were neglecting the children's medical needs.  In view of the
17  information Defendant Landry possessed on May 2, 2005, she had reasonable cause to believe the
18  children were in imminent risk of serious bodily injury if they remained at ALA.

19  The court further finds that the scope of the intrusion was necessary to avert the
20  demonstrated risk of injury.  The children were housed safely at other juvenile facilities and were
21  released to their parents within three days.  This intrusion was reasonable under the circumstances.

22  Defendants have met their initial moving burden by presenting evidence that they had
23  reasonable cause to remove the ALA children. In response, Plaintiffs failed to set forth evidence
24  showing there is a genuine issue of fact for trial.  Consequently, the court grants Defendants' motion
25  for summary judgment as to Plaintiffs' Fourth Amendment claim.

26

15

### ii. 14th Amendment Due Process

Plaintiffs' complaint also alleges a substantive due process claim against Defendants. Plaintiffs argue that Defendants interfered with Parent Plaintiffs' freedom of personal decisions about the care, custody, and control of their children.  (Pls. Opp'n to Defs.' Mot. for Summ. J. (#86) at 11.)  Defendants counter that Plaintiffs' Fourteenth Amendment rights were not violated because Defendants were obligated to remove the children from unsafe conditions.  (Defs. Mot. for Summ. J. (#80) at 12.)  Because the circumstances warranted intrusion upon the liberty interest of Plaintiffs' rights to direct the education and upbringing of their children, the court finds Defendants did not violate Plaintiffs' Fourteenth Amendment rights.

Substantive due process, granted by the Fourteenth Amendment, affords parents, grandparents, and guardians the liberty to "direct the upbringing and education of children under their control."  *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-535 (1925).  The Supreme Court has deemed this right fundamental.  *See Troxel v. Granville*, 530 U.S. 57, 66 (2000).  However, this right is also subject to reasonable regulation by the state, especially in a school environment.  *See Runyon v. Gonzales*, 427 U.S. 160, 178 (1976).  For instance, the Supreme Court has stated, "No question is raised concerning the power of the state reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require . . . that teachers shall be of good moral character . . . and that nothing be taught which is manifestly inimical to the public welfare."  *Pierce*, 268 U.S. at 534.  Thus, Parent Plaintiffs' liberty interest in the upbringing of their children is limited by the state's equally compelling interest in the protection of minors.  *See, e.g.*, *Kruse v. Hawai'i*, 68 F.3d 331, 336 (9th Cir. 1995); *Wilkinson ex rel. Wilkinson v. Russell*, 183 F.3d 89, 104 (2d Cir. 1999); *Mansano v. South Dakota Dep't of Social Serv's.*, 60 F.3d 505, 510 (8th Cir. 1995).

As employees of DCFS, Defendants' had a compelling interest in protecting the ALA children.  *See Woodrum v. Woodward County, Okl.*, 866 F.2d 1121, 1125 (9th Cir. 1989). Furthermore, Defendants were acting pursuant to Nevada statutes authorizing investigations upon

16

reports of chid abuse.  *See* Nev. Rev. Stat. Ch. 432B.  Had Defendants failed to investigate ALA or intervene with the custody of the ALA students, they would have been in contravention of their statutory duties, since child abuse and neglect was suspected and later substantiated.  *See id.* at 432B.220, 260, 300 (mandating that any social worker who knows or has reasonable cause to believe that a child has been abused or neglected shall report the abuse to child welfare services, who shall immediately initiate an investigation and determine whether the child is in immediate and long-term risk if the child remains in the environment).  Not only did Defendants receive two complaints from parties expressing concerns for the safety and well-being of the ALA students, but Defendants also observed living conditions and received reports from the students substantiating the prior complaints.

In sum, Defendants had a compelling interest in protecting the ALA children.  This interest superseded Parent Plaintiffs' liberty interest in giving the ALA custody of their children.  *See Mabe v. San Bernardino County, Dep't of Pub. Soc. Serv.*, 237 F.3d 1101, 1106-08 (9th Cir. 2001).  Therefore, Plaintiffs' Fourteenth Amendment rights were not violated, as Defendants had reasonable cause to investigate and remove Minor Plaintiffs from ALA.  Defendants' motion for summary judgment is therefore granted with respect to this claim.

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Summary Judgment (#61) is hereby DENIED.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment (#74) is hereby GRANTED.

///

///

///

///

///

17

1    IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment (#80) is

2  hereby GRANTED.

3    The court clerk is directed to enter judgment accordingly.

4    IT IS SO ORDERED.

5    DATED this 27th day of March, 2008.

6

7

8

9    _____
     LARRY R. HICKS
     UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

18